IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2011

## SAMANTHA MARIE DANIEL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Marion County**
**No. 8308     J. Curtis Smith, Judge**

_____

**No. M2010-00981-CCA-R3-PC - Filed June 13, 2011**

_____

The petitioner, Samantha Marie Daniel, appeals the denial of her petition for post-conviction relief from her convictions for first degree murder and attempted first degree murder, arguing that the post-conviction court erred in finding that she received effective assistance of trial counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Robert D. Philyaw, Signal Mountain, Tennessee, for the appellant, Samantha Marie Daniel.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Sherry Shelton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted by a Marion County jury of the first degree murder of her grandfather and the attempted first degree murder of her grandmother and was sentenced by the trial court to concurrent terms of life and twenty years in the Department of Correction. Her convictions were affirmed by this court on direct appeal, and our supreme court denied her application for permission to appeal. State v. Samantha Marie Daniel, No. M2005-01211-CCA-R3-CD, 2006 WL 3071329, at *1 (Tenn. Crim. App. Oct. 30, 2006), perm. to appeal denied (Tenn. Mar. 12, 2007).

The petitioner's convictions were based on acts she committed at the age of fifteen, when, following an argument with her grandparents, she shot and killed her sleeping grandfather and then attempted to kill her grandmother, leaving her critically wounded. Id. at *1-3. Our direct appeal opinion summarizes the evidence that was presented in support of the defendant's convictions at trial:

The record reflects that the [petitioner] obtained the shotgun and shotgun shells from her grandfather's room, returned to her room where she loaded the shotgun, and then reentered the room in which her grandfather was sleeping, prior to shooting him in the face at close range. When her grandmother returned home, the [petitioner] pointed the gun at her grandmother while Mrs. Daniel exclaimed, "Oh, God, Baby, please no." The [petitioner], nevertheless, shot her grandmother, nearly blowing off her right arm. Then she shot her grandmother in the abdomen. The [petitioner] then reloaded the shotgun and shot her grandmother a third time as Mrs. Daniel tried to hide behind a partially closed bedroom door. The [petitioner] disconnected all the telephone lines and took her grandmother's cell phone before fleeing in her grandparents' red Camero. The [petitioner] drove to her friend Jessica Barnes' house where she burned her bloody clothes, before returning the Camero to her grandparents' home. She spent the next day hiding at the Barnes' house and driving out of town to avoid detection. Regardless of her young age, the circumstances surrounding the shootings, both before and after, demonstrate premeditation. Dr. [Mark] Peterson's testimony does not contradict the State's proof that the [petitioner] acted with premeditation when she shot and killed her grandfather while he slept and then shot her grandmother three times, as she pleaded for mercy and tried to hide behind a door.

Id. at *11.

Upon her arrest, the petitioner gave a statement to police in which she explained her actions:

In her statement, the [petitioner] related that on Friday, November 15, 2002, she attended a party at the home of Jessie Royer, a female friend of the [petitioner]. According to the [petitioner], she frequently left her grandparents' home without permission. On this particular occasion, she explained that she had left her grandparents' home without permission and had been gone for three or four days. While at Royer's party, the authorities arrived and returned the [petitioner] to her grandparents' home. Upon arriving home, the [petitioner] immediately began to argue with her grandparents

-2-

because she would not tell them where she had been staying for the three nights she was absent. The argument continued until early Saturday morning. On Sunday evening, the [petitioner], who had her learner's permit, drove her grandparents to a restaurant in Manchester for dinner. During the ride home, the [petitioner] asked her grandparents if she could attend a party at Royer's house, with the request being denied. Upon returning home, Mrs. Daniel thought the tensions had eased and walked to her son's nearby home, leaving the [petitioner] in her bedroom. The [petitioner] stated that while she was in her bedroom, she kept "getting madder and madder about the stuff that had happened between [her] and [her] grandparents." She then entered the bedroom in which her grandfather was sleeping and removed a shotgun hanging on the wall and a number of shells from a drawer before returning to her room to load the gun. The [petitioner] related:

> I walked back into my grandfather's room. He was asleep. He was lying on his side. So when I walked in the door, he was facing me. I walked probably one step inside the door. I pointed the gun at his head, I turned my head and pulled the trigger. I fell down on the floor because I could not believe what I had done. I had heard my grandmother's door open. And I was walking back toward my room my grandmother came around the edge of the kitchen. I cocked the gun again and I shot her. She fell.

> Then I went and unplugged the phones. There are three phones in the house, there are two in the living room and one in the kitchen. I then ran back into my bedroom and started getting dressed because I was in my boxers and T-shirts when that happened. As I was getting dressed I heard my grandmother coming back towards my room. I sat down in the doorway. The gun was propped against my door frame. My grandmother was walking towards me. I told her to get away. She kept walking towards me. She was not saying anything. I grabbed the shotgun and put another shell in it, and cocked it. I had to stand up to get the bullet because it was lying on the bed. When I got the shell and came back to the door with the gun, my grandmother was standing in the doorway of my grandpa. The door to his room was halfway closed. I then shot my grandmother again.

Mrs. Daniel testified that she was unable to summon any help because her right arm was hanging from her body by one artery and she was suffering from a gunshot wound to her abdomen. She crawled to her husband's bedroom and managed to crawl into the bed with her deceased husband, covered them both, and said a final prayer.

Id. at *2.

The petitioner subsequently filed a timely *pro se* petition for post-conviction relief, followed by an amended petition after the appointment of counsel, in which she raised a claim of ineffective assistance of counsel. Specifically, she alleged that counsel was ineffective for failing to properly prepare her trial testimony; for failing to investigate or present evidence to show the abuse she allegedly suffered at the hands of the victims; and for failing to present evidence through medical testimony about her mental health, which would have shown that she was incapable of forming premeditation.

At the evidentiary hearing, trial counsel, who was the elected public defender for the district and had been licensed to practice law since 1973, testified that he first met with the petitioner on the night she was arrested. The petitioner was quiet, reserved, and suspicious, and he spent approximately two hours with her at that first meeting attempting to establish a rapport and to gain her trust. He and the petitioner discussed a number of topics in their many successive meetings, including her tumultuous background, which involved her abandonment by her biological mother, the history of alcohol abuse within the family, the fact that she had received very little instruction in her home schooling program, and her pattern of having been bounced back and forth between her grandparents' and her father's homes. They also discussed the petitioner's recent treatment at Cumberland Hall and her allegations of physical and sexual abuse at the hands of her grandparents. Specifically, the petitioner told him that her grandmother had hit her with her closed fist at least once in her rib cage. In addition, she mentioned to him and testified at trial that her grandfather had instructed her on the use of his penile surgical implant and, after having her inflate it, had her put it in her mouth.

Trial counsel acknowledged that he did not ask the petitioner any specific questions at trial about the alleged physical abuse by her grandmother and that he did not introduce photographs, which he had reviewed, that showed red spots on the petitioner's side. He also did not dwell at great length at trial on her allegations of sexual abuse by her grandfather. Counsel explained that he made a strategic choice not to do so based on his belief that jurors do not need to be "hit . . . repeatedly between the eyes" in order to receive a message:

Well, I don't know if I would call it briefly [the amount of time he

-4-

questioned the petitioner about the abuse]. We talked about the implant, we talked about her knowledge of it, how she became aware of it, and those issues. I made a decision that at some point that a further inquiry was not necessary to convey the message that I wanted to convey, and that was that this was not a perfect family of any type, and so did I say how many different times did you pump or whatever, no, we did not go beyond simply how did you know about it and how it functioned and those types of questions. And that was a decision I made as a trial lawyer that, that information got before the jury for them to weigh and consider it.

Trial counsel recalled that the petitioner had been released from treatment at Cumberland Hall approximately one to two months prior to the events at issue in the case. He said that he obtained and reviewed the petitioner's Department of Children's Services ("DCS") files, educational records, and files from Cumberland Hall, in addition to speaking to Cumberland Hall representatives, including Suzanne Bloom, about the petitioner's treatment at that facility. His recollection was that allegations of physical or sexual abuse were not the precipitating factors that led to her placement at Cumberland Hall. Instead, he recalled that it was more of a "run away situation," in which the petitioner had left home without permission. During his later testimony on cross-examination, trial counsel further explained that the petitioner did not raise her allegations of sexual abuse against her grandfather until trial; there was no mention of such allegations in her DCS or Cumberland Hall records.

Trial counsel testified that his basic approach to the case was to attempt to show that the petitioner lacked the ability to form the mental intent for the crimes. He said that he was familiar with Dr. Peterson, a psychiatrist he had used in another case, and that he spoke with him for a sufficient amount of time before trial to be satisfied that he would make a good witness for the defense. He acknowledged that during his direct examination at trial he asked Dr. Peterson about "a," rather than "this," fifteen-year-old's capacity to premeditate. He said that because the petitioner had been a patient of Dr. Peterson and was the only fifteen-year-old at issue in the case, it never occurred to him that his question had been too broadly worded until he read this court's direct appeal opinion, which noted the distinction.

Trial counsel testified that he spoke with the petitioner at length about her trial testimony and her demeanor and appearance in the courtroom. Although he stressed the importance of her sharing her feelings during her trial testimony, he was not sure that he ever got the message across. According to counsel, the petitioner either did not trust him or else refused to accept his advice about showing her emotions. Trial counsel testified that the petitioner was as prepared as he knew how to make her for trial, but he was obviously unsuccessful in impressing upon her the need to display her emotions. In fact, he "rarely saw

any display of emotion from her."

Trial counsel testified that he did not introduce a videotape from a service station the petitioner had allegedly visited because one officer testified that the petitioner was on the tape while another officer testified that she was not. He explained: "I don't know why you need to . . . introduce a tape when a guy says it doesn't show this individual at the station at the time that somebody said she was there, so you already have one officer contradicting another officer, and that, to me, pretty much satisfies whether or not there's any question about it." He further explained his belief that whether the petitioner was at the station was "immaterial."

On cross-examination, trial counsel, who conservatively estimated that he spent over 500 hours on the case, testified that he filed numerous motions, both in juvenile and circuit court, including motions to suppress the petitioner's statement, to quash the indictment, for a mental evaluation of the petitioner, to strike the jury venire, and to waive a jury trial. He acknowledged that the petitioner came across as very unemotional in her testimony and agreed that there was no way for him to get a witness to show emotion or remorse if he or she feels none. He stated that he thought it was clear to the jury that Dr. Peterson's testimony about "a" fifteen-year-old's abilities, despite the poor wording of his question, referred to the petitioner, who was the only fifteen-year-old child at issue in the trial. Finally, he testified that he represented the petitioner to the best of his ability and could not think of anything he overlooked in the case.

Dr. Mark Peterson testified that his impression of the petitioner, as her attending psychiatrist, was that she was "a very troubled youth having some major difficulties with her upbringing" in addition to some trauma issues, which were handled through the counseling staff at Cumberland Hall. He recalled that he diagnosed her with severe depression, which he treated with the use of antidepressants. According to Dr. Peterson, a side effect of such medication can be an "emotional blunting," which can manifest as a "flattened" appearance and a "flat affect." He said he could not recall trial counsel's having talked to him about the effect of the petitioner's medications.

Dr. Peterson testified that trial counsel asked him at trial about the frontal lobe development in the maturation process of the central nervous system of a typical fifteen-year-old. Although the question arose in the context of his testimony about his treatment of the petitioner, counsel never specifically asked him to relate his general testimony about a fifteen-year-old's development to the petitioner, which surprised him. He stated that had counsel asked him specifically about the petitioner, he would have testified that she "was a 15-year-old acting very impulsively and immaturely without access to full judgment," based not just on her age, but also on how she presented at Cumberland Hall. On cross-

-6-

examination, he acknowledged that trial counsel elicited testimony from him that a person who presents with a flat affect is, in his opinion, either holding back her emotion or unable to feel anything at that moment.

The petitioner complained that her conversations with counsel were not very lengthy and that she felt as if counsel did not listen to her concerns. She said that counsel spoke to her briefly about her testimony and her courtroom appearance but did not fully prepare her for the questions or instruct her on how to behave while testifying. She stated that she had been overcome by emotion during her trial testimony but that she was not the type of person who displays emotion. In her opinion, had counsel better prepared her trial testimony, she would have been able "to not let [her] emotions" become "overwhelming" and would have testified very differently, presenting a more favorable appearance to the jury.

## ANALYSIS

The petitioner contends that the post-conviction court erred in finding that she received effective assistance of trial counsel. Specifically, she alleges that counsel was ineffective for failing to adequately prepare her to testify, failing to properly investigate her allegations of abuse, and failing to present evidence relating to her mental state. She also alleges that counsel was ineffective for failing to introduce the videotape from the service station, which would have damaged the credibility of one of the State's witnesses.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal

cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The petitioner first argues that trial counsel was ineffective for failing to adequately prepare her for trial. In denying relief on the basis of this claim, the post-conviction court found that counsel was an "experienced and well-qualified defense attorney" who had spent hours in preparation and presentation of the petitioner's case. The court also noted counsel's testimony regarding the advice and trial preparation he provided to the petitioner, as well as the fact that the petitioner's emotionless trial testimony was consistent not only with her demeanor immediately following the shootings but also with her own description of her personality. The court, therefore, concluded that trial counsel provided effective assistance in his pretrial preparation of the petitioner's testimony.

The record fully supports the findings and conclusions of the post-conviction court. Trial counsel, an imminently experienced and well-qualified defense attorney, testified that he spent well over 500 hours in preparation for the case, which included numerous meetings with the petitioner and discussions on her appearance and demeanor in court. He was also confident that he spoke with her about how her emotions and feelings would be important and that she needed to avoid an aloof and distant manner during her testimony. Thus, the

record establishes that trial counsel adequately advised and prepared the petitioner for her testimony. The fact that the petitioner was either incapable or unwilling to heed counsel's advice about displaying her emotions does not render his performance deficient. The petitioner is not entitled to post-conviction relief on the basis of this claim.

The petitioner next argues that trial counsel was ineffective for failing to introduce evidence of her mental state, which would have shown that she was incapable of premeditating the crimes. The petitioner bases this argument on counsel's failure to ask Dr. Peterson specific questions about her frontal lobe development, as opposed to the frontal lobe development of a typical fifteen-year-old. She asserts that "[b]ut for trial counsel's failure to ask the right questions, the jury would have heard of her mental deficiencies and lack of ability to process information, make decisions and understand consequences, which cuts to the heart of an essential element of the crimes for which she was tried."

The post-conviction court made the following findings and conclusions with respect to this claim:

> Petitioner's proof and argument in this issue centered around [trial counsel's] direct examination of defense witness Dr. Peterson on the subject of petitioner's capacity to form premeditation. [Trial counsel] had called Dr. Peterson to testify about the maturation process of the human brain in order to counter the state's case for premeditation. The Court of [Criminal] Appeals noted [trial counsel] used the phrase "a fifteen year old" rather than saying "this fifteen year old" when eliciting testimony from Dr. Peterson that at age 15 an individual's frontal lobe is still making "a huge number of connections," is the last area to mature in the central nervous system and as a result that 15-year-olds do not have the ability to make the planned and thoughtful decisions of an 18 or 20-year-old. Regardless of whether [trial counsel's] question to Dr. Peterson was perfectly posed, petitioner was 15 years old at the time of the offense and common sense dictates the trial jury understood Dr. Peterson was called by the defense, was petitioner's physician and therefore his testimony concerned the petitioner. The proof at trial and at the post-conviction hearing clearly established [trial counsel] recognized that showing lack of premeditation was central to petitioner's defense and that he pursued that defense. On this issue, petitioner has failed to show that [trial counsel's] representation fell below the standards in Baxter and Strickland, supra.

The record, again, fully supports the findings and conclusions of the post-conviction court. We agree that, given the facts of the case and the context in which the questioning occurred, it would have been clear to the jury that Dr. Peterson's testimony about the mental

-9-

development of a fifteen-year-old applied to the petitioner. We further agree that the record establishes that trial counsel was well aware of the importance to the defense of showing the petitioner's inability to form the mental intent for the crimes. Trial counsel described his approach to the case:

> Basically, when I think about the way I was approaching this case, we were dealing with an immature 15-year-old. I thought this case primarily was a mental elements case. It wasn't a who-dun-it. There wasn't any question about that. We'd gone through all the steps about a statement that she'd given to, I think it was Wayne Jordan, and so the concern was, from my perspective as a trial lawyer, blowups in families are not unusual in and of themselves. That happens. I'm saying this based on - - at the time I would have been practicing law 30-plus years, and to me the important issue was her mental state, and forces at play in that, and what would, you know, places like Cumberland Hall provide and how they treat and deal with a person of her age.

The petitioner also complains about trial counsel's failure to elicit testimony from Dr. Peterson about the petitioner's use of antidepressants and their effect on her personality and affect. The record establishes, however, that trial counsel was able to elicit from Dr. Peterson possible explanations for the petitioner's flat affect and emotionless manner. We cannot agree that counsel was deficient in his representation for failing to specifically question Dr. Peterson about the petitioner's antidepressants or that his failure to do so prejudiced the outcome of the case. We conclude, therefore, that the petitioner is not entitled to post-conviction relief on the basis of this claim.

The petitioner next argues that trial counsel provided ineffective assistance by failing to present evidence of the abuse she allegedly suffered at the hands of the victims and by failing to introduce the videotape from the service station. In denying relief on the basis of this claim, the post-conviction court noted that the petitioner failed to report the alleged abuse to either the DCS or Cumberland Hall personnel, and that counsel questioned the petitioner about some of the alleged sexual abuse during his direct examination at trial. The court then concluded that, given the facts, trial counsel made sound strategic and tactical decisions with respect to the abuse allegations, as "[t]o have raised the issue of abuse while the records contained little more than some photos showing some redness on the petitioner's body could have damaged the petitioner's credibility subjecting her to cross-examination on why she never reported any abuse when she had ample opportunity to do so."

The record, once again, fully supports the findings and conclusions of the post-conviction court. Trial counsel, a lawyer with over thirty-seven years experience by the time of the evidentiary hearing, explained his belief that jurors do not need to be repeatedly "hit

. . . between the eyes" to receive a message and that it was a strategic choice not to question the Cumberland Hall witness about the petitioner's allegations of physical abuse by her grandmother and not to dwell at length on her allegations of sexual abuse by her grandfather. Trial counsel also explained his strategic choice not to introduce the videotape from the service station. The petitioner is not, therefore, entitled to post-conviction relief on the basis of these claims.

## **CONCLUSION**

Based on our review, we conclude that the petitioner has not met her burden of showing either a deficiency in counsel's performance or resulting prejudice to her case. Accordingly, we affirm the denial of her petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE